KAREN NELSON MOORE, Circuit Judge,
dissenting.
I would hold that there is a genuine dispute of material fact as to whether the *549 use of force was excessive, that appellant has not waived his argument on appeal, and that neither officer is entitled to qualified immunity.
I. Whether There is a Genuine Dispute of Material Fact
Like Scott v. Harris, this case hinges on a videotape of the incident. 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). But unlike Scott v. Harris, the videotape does not warrant summary judgment, as it does not foreclose Scottie Pennington’s version of the facts.[1] See id. at 386, 127 S.Ct. 1769.
The videotape is far from a pellucid recording: the audio is muffled and the image quality is poor. The videotape also goes in and out of focus and, perhaps coincidentally and perhaps not, is out of focus during the most crucial moments of the arrest. When the officers first pull up behind Robert Caudill, and Brian Long walks up to the passenger’s side of Cau-dill’s truck, the image is clear enough to see Long’s duty belt and to distinguish the different objects attached to it (one, which he rests his left hand on momentarily, is in the shape of a gun or a taser). R. 29 (Videotape at 1:26-2:04) (Page ID # 167). Less than a minute later, as Long and James Harris hold Pennington and tell him to spit out the pills he has swallowed, the image goes out of focus. Id. at 2:29-2:50. Though the viewer should be able to see Harris’s duty belt and the objects attached to it, as Harris’s side and part of his back are turned toward the camera, the image is too-blurry to make them out with any confidence. The image is clearer as the officers pin Pennington down on his stomach and Long handcuffs Pennington. See id. at 3:03-3:21.
The videotape goes out of focus again when Harris flips Pennington over oh his back. See id. at 3:47-3:54. Long, standing up, holds a flashlight in his right hand and points it at Pennington. Id. at 3:54— 3:58. Harris, standing to Long’s right, reaches for Long’s flashlight with his left hand. Id. at 4:01. Harris bends over, passes the flashlight from his left hand to his right hand, and shines it in Pennington’s . mouth. Id. at 4:02-4:04. Long bends down, joining Harris, and points at Pennington’s mouth, remarking, “it’s right there on your teeth.” Id. at 4:04-4:06. Harris then stands up and hands the flashlight to Long, passing it back from his right hand to his left hand. Id. at 4:06-4:08. Harris then reaches his right hand around his body to his duty belt |nd grabs a dark object — an object which we know is a taser because Harris swore it was in an affidavit before the district court. Id. at 4:08-4:09; see also R. 57-2 (Second Harris Affidavit at 1) (Page ID #244). The ta-ser, against Harris’s dark uniform and the night sky, is barely discernable: it is only Harris’s hand, which looks like it is holding something, that suggests its presence.[2] R. 29 (Videotape at 4:08-4:09) (Page ID # 167). Harris says “here, here you go,” turns Pennington over, and straddles him. *550 Id. at 4:09-4:12. Bending over Pennington, Harris moves his right hand, which appears to still have the taser in it, toward Pennington’s shoulder or side:
[[Image here]]
Id. at 4:14. Pennington says “oh, oh, I ain’t got it!” Id. at 4:14-4:16. As he does, the image snaps back into focus, and Harris can be seen more clearly, the taser in his right hand and a smaller object in his left hand. Id. Harris appears to attach the smaller object to the front of the taser, which he then holsters. Id. at 4:16-4:22.
Though the viewer can glean the broad strokes of what happened from the videotape, the viewer cannot determine the specific details with any certainty, and it is the specific details that are critical to Pennington’s case. The majority’s error is in treating the videotape as if it depicts all details clearly such that the majority can simply view the videotape, compare it to Pennington’s version of the incident, and conclude that the videotape forecloses his claim. See Maj. Op. at 689-41.
For example, the majority asserts that “Harris’s right hand, holding the [tjaser, came close to the right side of Pennington’s stomach but never touched it.” ’ Id. at 536. Later in its opinion, the majority goes even further, claiming that “Harris removed a [t]aser from his holster [and] held it inches away from the right side of Pennington’s body” — a fine line to draw *551 for such a blurry -video. Id. at 540. The majority further asserts that in response to Harris’s movements, “Pennington did not exhibit any signs of pain or physical agitation.” Id. at 536.
The problem with these statements is that the videotape does not support them. The outline of the taser is barely discerna-ble. R. 29 (Videotape at 4:08-4:09) (Page ID # 167). It is impossible to tell how close the taser gets to Pennington, and whether it touches him. Id. As for Pennington’s reaction, when Harris moves his right hand toward Pennington, Pennington lets out what sound like two cries (the district court described them as “two short yells”) before he says “I ain’t got it!” Id. at 4:14-16: R. 69 (Dist. Ct. Op. at 3) (Page ID #287). Admittedly, these cries may not be in reaction to the taser. Indeed, they may not even be cries: Pennington may simply be raising his voice in agitation. But the videotape is not clear either way.
What the majority has done is make its own factual determinations. And in making these determinations, the majority has overlooked the genuine disputes of material fact that the videotape creates. Because it is not clear whether the taser touched Pennington or whether he reacted to it, these questions deserve to go to a jury. It is not our place to decide them. Taking the evidence, blurry as it is, in the light most favorable to Pennington, the majority should have concluded that a reasonable jury could find that Harris’s taser touched Pennington and that Pennington reacted with two cries. The videotape is far too unclear and Pennington’s claim far too nuanced for the videotape to warrant, summary judgment.[3]
II. Whether Pennington Waived his Qualified-Immunity Argument
On appeal, Pennington argues that Harris cannot claim to have tasered Pennington to preserve evidence or prevent an overdose, as Harris had already checked Pennington’s mouth and knew there were no pills in it. Appellant Br. at 19-20. The majority refuses to consider this argument because “[i]ssues not raised before the district court are generally inappropriate for appellate consideration.” Maj. Op. at 542 (citing Scottsdale Ins. Co. v. Flowers, 513 F.3d 546, 552 (6th Cir.2008)). I do not think this argument can be fairly characterized as an issue not raised before the district court; it is simply an expansion of Pennington’s response to defendants’ claim of qualified immunity — one that is warranted in light of the district court’s opinion. Even if it is a newly raised issue, our precedent establishes simply a general rule against considering it, not an absolute bar. Because Pennington’s argument does not unfairly prejudice defendants or require a factual determination, an exception to the general rule is appropriate.
Pennington brought an excessive-force claim in his complaint before the district court. R. 1 (ComplJ 11) (Page ID # 3). Defendants responded with a motion for summary judgment arguing that there was no genuine dispute of material fact and *552 that, in the alternative, the officers were entitled to qualified immunity. R. 20 (Mot. for Summ. J. at 1-5) (Page ID #46-50). In their memorandum, defendants listed five facts that they claimed the videotape established, including that Harris “used reasonable force to prevent the destruction of the evidence and the ingestion of the illegal narcotics” (a fact defendants listed immediately before the fact that Harris and Long “used reasonable force in placing Mr. Pennington on the ground and applying the handcuffs to him”). R. 27 (Mem. in support of Mot. for Summ. J. at 23) (Page ID # 156). The order of these facts suggests that the force to which defendants were referring in the earlier fact was the force Harris used when lunging at Pennington, not when tasering him, which was done after Pennington was handcuffed.
Defendants also never explicitly connected their contention that Harris “used reasonable force to prevent the destruction of the evidence and the ingestion of the illegal narcotics” to their contention that Harris was entitled to qualified immunity. After listing the remaining facts, defendants concluded, “The video clearly and conclusively establishes that neither Sergeant Harris nor Officer Brian Long were guilty of excessive force as a matter of law and the force which they used was objectively reasonable under the circumstances.” Id. at 24 (Page ID # 157). Defendants then asserted, “In the alternative, these Officers are entitled to qualified immunity.” Id. To be clear, nowhere in their memorandum did defendants advance the argument that Harris was trying to preserve evidence and prevent an overdose by tasering Pennington, and that these objectives entitled him to qualified immunity. In response, Pennington, not surprisingly, argued only that the officers were not entitled to qualified immunity because he was not actively resisting when they tasered him. R. 56 (Resp. to Mot. for Summ. J. at 3) (Page ID # 235).
Defendants did not further develop their argument that Harris “used reasonable force to prevent the destruction of the evidence and the ingestion of the illegal narcotics” in their reply brief. R. 57 (Reply Br. at 1-3) (Page ID # 237-39). The district court, however, did: in its opinion, it explained that the use of a taser may be reasonable where a suspect poses a threat to a law-enforcement' aim, such as the preservation of evidence or the prevention of an overdose. R. 69 (Dist. Ct. Op. at 9-10) (Page ID # 293-94) (citing Boyden v. Twp. of Upper Darby, 5 F.Supp.3d 731, 738 (E.D.Pa.2014); Love v. Rockford Ill. Mun. Police Dep’t, No. 08 C 50254, 2013 WL 159246, at *2 (N.D.Ill. Jan. 15, 2013); Monday v. Oullette, 118 F.3d 1099, 1101 (6th Cir.1997); Singleton v. City of Newburgh, 1 F.Supp.2d 306, 308 (S.D.N.Y.1998)). The district court appears to have done this research on its own, as none of the cases it cites are in defendants’ motion for summary judgment. Id.; see also R. 20 (Mot. for Summ. J.) (Page ID # 46); R. 27 (Mem. in support of Mot. -for Summ. J.) (Page ID # 134).
In appealing the district court’s decision, Pennington maintains that he was not actively resisting and adds that Harris cannot claim that he tasered Pennington in order to preserve evidence or prevent an overdose because Harris had already inspected Pennington’s' mouth — an addition that makes perfect sense given the district court’s development of defendants’ assertions. Appellant Br. at 17-24. Pennington’s argument, therefore, is not an issue raised for the first time on appeal. It an expansion of Pennington’s earlier argument and a response to the district court’s opinion.
*553 Even if Pennington’s argument is an issue raised for the first time on appeal, it merits an exception. First, considering Pennington’s argument does not unfairly prejudice defendants, as the argument is not an “unfair surprise! ].” See Allstate Ins. Co. v. Glob. Med. Billing, Inc., 520 Fed.Appx. 409, 412 (6th Cir.2013). Defendants had the videotape in their possession, and the videotape includes the following exchanges which all occur before Harris allegedly tasers Pennington:
Pennington: I ain’t got no evidence.
Harris: I know you don’t. It’s in your belly now.
R. 29 (Videotape at 3:34-3:36) (Page ID # 167).
Harris: You just swallowed it then!
Id. at 4:00-4:02.
Long: It’s [referring to residue] right there on your teeth.
Id. at 4:04-4:06. Defendants also acknowledged in their motion for summary judgment that the officers searched Pennington’s mouth shortly after handcuffing him:
Officer Long and Sergeant Harris then took Mr. Pennington to the ground where Officer Long handcuffed Pennington’s hands behind his back. Sergeant Harris continued to examine Pennington’s mouth for evidence of the narcotic drugs which he had seen him put in his mouth. One pill was spit out. Another pill may have been found on the ground where Pennington dropped it. Sergeant Harris turned Pennington over and examined his mouth to determine if any more pills remained in his mouth.
R. 27 (Mem. in support of Mot. for Summ. J. at 3) (Page ID # 136).
Second, the majority’s assertion that the general rule against considering newly raised issues “applies with even greater force when the issue ‘necessitates a determination of the facts’” makes the same error as its summary-judgment analysis. Maj. Op. at 542. In a qualified-immunity inquiry, the court takes the facts “in the light most favorable to the party asserting the injury.” See Scott, 550 U.S. at 377, 127 S.Ct. 1769. “At the summary judgment stage, ... once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record, ... the reasonableness of [the defendants’] actions ... is a pure question of law.” Id. at 381 n. 8, 127 S.Ct. 1769 (emphasis removed). ' Thus, there is no need for a factual determination. With no prejudice to defendants or factual determination required, an exception to the general rule is warranted.
Accordingly, I would conclude that Pennington’s argument is not waived and that therefore the questions before the court are whether Pennington had a clearly established right not to be tasered while handcuffed and complying, and whether the officers violated that right. Given our case law on the subject, as well as our obligation to take the facts in the light most favorable to the party asserting the injury, I would answer yes to both questions. See, e.g., Thomas v. Plummer, 489 Fed.Appx. 116, 127-29 (6th Cir.2012); Kijowski v. City of Niles, 372 Fed.Appx. 595, 600-01 (6th Cir.2010); Landis v. Baker, 297 Fed.Appx. 453, 461-64 (6th Cir.2008). The majority seeing this differently, I respectfully dissent.

. Though Pennington's version of events has evolved since he filed his complaint, he was proceeding pro se for the first part of the litigation (including when he was deposed). He did not secure counsel until shortly before' he filed his response to defendants’ motion for summary judgment. See R. 47 (Notice of Appearance) (Page ID #213). Thus, some development of the facts was both expected and appropriate.

. The majority acknowledges how hard it is to see the taser: "Although difficult to discern with certainty from the video, we assume that Sergeant Harris did retrieve a [tjaser from his holster because Sergeant Harris concedes both in his appellate brief and in his affidavit before the district court that he removed a . [tjaser from his holster during the arrest,” Maj. Op. at 535.

. The majority's statements also imply that the district court’s conclusions were unreasonable. Maj. Op. at 538 (explaining that "a court need draw only reasonable inferences in favor of the nonmoving party; it need not construe the record in such a manner that is wholly unsupportable — in view of any reasonable jury — by the video recording” (emphasis in original) (internal quotation marks omitted) (quoting Shreve v. Franklin Cty., 743 F.3d 126, 132 (6th Cir.2014))); R. 69 (Dist. Ct. Op. at 3) (Page ID # 287) (observing that "Harris appeared to touch the taser to [Pennington’s] torso briefly” and that "[Pennington] gave two short yells”).